**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

UNITED STATES OF AMERICA,     )
     )
    Plaintiff,     )
     )
v.     )    No. 21-cr-20216-JTF-tmp
     )
TOMMIE CONNER,     )
     )
    Defendant.     )

_____

**AMENDED REPORT AND RECOMMENDATION**

_____

Before the court by order of reference is defendant Tommie Conner's Motion to Suppress. (ECF No. 45.) The undersigned conducted two hearings on Conner's motion. The undersigned initially held a hearing with no witness testimony on June 9, 2023. (ECF No. 55.) Based on the parties' briefs, the evidence, and argument presented at the hearing, the undersigned entered a report and recommendation, recommending that suppression be denied. (ECF No. 60.) Conner then filed a Motion to Reopen Suppression Hearing and Suppress Evidence, explaining that he learned of "new evidence" because defense "[c]ounsel had technical issues with his copy [of the body camera footage] to which the Government provided another copy." (ECF No. 66.) In order to allow Conner to further develop the record, the undersigned granted the motion and set a second hearing. (ECF No. 69.) The second hearing took place on December

19, 2023, at which Officers Ryan Walker and Jacques Roberts both testified. (ECF No. 75.)[1] For the reasons below, the undersigned recommends that the motion be denied.

## I.    PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the testimony presented at the December 19 hearing from Memphis Police Department ("MPD") Officer Walker and former MPD Officer Roberts, the evidence presented at both hearings, as well as the parties' briefs. Between the two hearings, the evidence presented included the officers' testimony, body-worn camera footage from Officer Walker, dashcam footage from his vehicle, several maps, and the MPD policies and procedures relating to pacing vehicles.[2] The undersigned finds the testimony of the officers credible.

On March 4, 2021, MPD Officer Roberts was driving east on American Way in an unmarked police car. (Dec. Tr. at 60–61.) He observed a black Dodge Durango turn onto American Way, which has a forty-five mile per hour speed limit. (Id at 56.) The vehicle headed east and sped up. (Id.) Officer Roberts accelerated to catch up, then drove one lane over about twenty feet back, "matched their speed, paced them for a set distance and estimated their speed to

---

[1]On January 5, 2024, the parties filed their Joint Proposed Exhibit List. (ECF No. 76.)
[2]"The officer should follow vehicle being paced at a constant interval for a distance adequate, normally two or more city blocks, to obtain a reading on speedometer indicating a speed exceeding that posted." (Ex. A, p. 12.)

be 60 miles an hour . . . ." (Id. at 56, 68–70.) Officer Roberts

paced the Durango from Clearbrook Street for about five to ten

seconds — "probably a quarter mile" — to a point before the Roadway

Inn,[3] at which point the vehicle slowed and turned toward the Inn.

(Id. at 61, 71.) Officer Roberts then called Officer Walker, his

task force partner, on the car-to-car radio. (Id. at 14, 17–18,

62.) Officer Roberts relayed to Officer Walker a description of

the Durango and the fact that it was speeding. (Id.)

Soon after, Officer Walker, who was driving in a marked police

car, began to follow the Durango, which was now heading west. (Id.

at 13, 21.) Officer Walker sped up and then followed the vehicle

down American Way from South Perkins to Cherry Road. (Id. at 24,

35.) In that time, Officer Walker paced the Durango, testifying

that he was driving "probably 48 miles an hour." (Id. at 23, 32,

36.) The speed limit was forty-five miles per hour. (Id. at 23.)

As he drove, Officer Walker held his PDA, "a cell phone that the

department issues us so we can do NCIC checks and use [to] access

criminal databases and things like that," in his left hand. (Id.

at 22.) He testified that he used the device to "verify[] the tag

on the vehicle at the time." (Id. at 23.) He testified that he

knew he was pacing at over the speed limit because "[t]here's a

big digital speedometer in the middle of the dash and there's also

_____

[3]It appears that the Roadway Inn has since been renamed the "Classic
Inn."

a mechanical one plus I have one on my GPS, and at that time I was going over 45 miles an hour and I was behind him." (Id.)

After tailing the car for a little less than a minute, Officer Walker activated his vehicle's lights and siren. (Ex. No. 3, video 1 at 0:59; Dec. Tr. at 43.) Immediately after, the driver of the Durango navigated into the parking lot of a Waffle House restaurant, pulling into a parking spot there. (Ex. No. 3, video 2 at 3:00.) Officer Walker pulled into the lot behind the Durango and came to a stop slightly behind it. (Id. at 3:13.) From where he was parked, Officer Walker was able to see only the passenger side of the Durango. (Id.) Footage from his vehicle's dashcam shows a shadow moving underneath the Durango, which the government asserts is the moment the driver exited the vehicle. (Id. at 3:23; June Tr. at 27.) Officer Walker stated multiple times throughout the body-worn camera footage that he personally did not witness anyone leaving the Durango. (Ex. No. 3, video 1 at 3:43.)

Several additional officers soon arrived at the Waffle House. (Ex. No. 3, video 2 at 4:05.) Officer Walker exited his police vehicle and approached the Durango with his flashlight. (Ex. No. 3, video 1 at 1:34.) Although not visible on the body-worn camera footage, Officer Walker later noted to his fellow officers that he observed both a magazine and a firearm in the vehicle. (Id. at 4:13, 20:28.) Seeing no person inside, he turned to a group of people who were gathered outside of the Waffle House and asked if

- 4 -

they had seen who exited the vehicle. (Id. at 1:53.) One individual pointed to the right, toward the corner of the Waffle House. (Id.) Officer Walker moved around the corner of the building and observed an individual walking away from the Durango. (Id. at 2:03.) This man was later identified as Tommie Conner. (Id. at 22:26.) Officer Walker approached Conner and questioned him about the Durango. (Id. at 2:03.) During that conversation, Conner denied being the owner of the Durango and eventually stated that he had been dropped off at the Waffle House. (Id.) After the exchange, Officer Walker disengaged from Conner but asked another officer on the scene to keep an eye on him. (Id. at 3:17.)

Officer Walker returned to the lot where his vehicle and the Durango were parked. (Id. at 3:30.) The officer tasked with watching Conner then told Officer Walker, "He's gone . . . He ran . . . ." (Id. at 4:04.) Hearing this, Officer Walker walked to the Home 1 Extended Stay, which shared the same parking lot as the Waffle House. (Id. at 4:24.) Unable to locate Conner, Officer Walker went back to where the Durango was parked and inspected the vehicle further. (Id. at 5:05.) While he did so, he called another officer and directed him to monitor the Home 1 Extended Stay, because "that's where [Conner] walked to." (Id. at 7:40.) Soon after, an officer radioed Officer Walker to say that he had spotted Conner. (Id. at 9:17.) Officer Walker re-entered his vehicle and navigated with several other officers to the Home 1 Extended Stay.

- 5 -

(Id. at 9:56.) There, the officers briefly chased Conner around the hotel but were unable to apprehend him. (Id. at 11:00.) A few minutes later, Officer Walker witnessed Conner once more walking nearby the Home 1 Extended Stay. (Id. at 15:14.) He yelled at Conner and began chasing him again. (Id.) This time, Officer Walker was able to catch up to Conner and place him in handcuffs. (Id. at 15:26.)

After being detained in the back of a police vehicle, Conner identified himself. (Id. at 22:26.) Once they had this information, police were able to confirm that the Durango was registered in Conner's name. (Id.) The officers ran a background check and learned that Conner had multiple felonies and a revoked driver's license. (ECF No. 45 at PageID 58.) They then obtained a search warrant. (ECF No. 49-1 at PageID 74.) In relevant part, the search warrant affidavit stated the following:

> On March 4, 2021 Officers of the Memphis Police Department attempted to pull over a black Dodge Durango for speeding westbound on American Way near Clearbrook Street. The driver of the Durango refused to pull over to the activated blue lights and sirens behind him. The Durango continued going westbound American Way [sic] until it pulled onto the private drive of Waffle House, 4276 American Way, and stopped on the southwest corner of the parking lot. At that time, the driver of the Durango opened the driver side door and ran from the vehicle. Officers were able to detain the driver after a brief foot chase. The driver was identified as Tommie Conner, showed to have a revoked driver's license as of 01/1997 for DUI. Officer returned to the Durango and could see through the driver window an orange and black handgun on the passenger floor board and a semi-automatic handgun magazine loaded with bullets on the

- 6 -

center console. Officers attempted to open the door to
the Durango, but it was locked. Conner refused to open
the vehicle and said he did not know where the keys to
his Durango were anymore. A check of Conner's
information showed not only was his driver's license
revoked, but he showed to be a convicted felon as of
05/03/2001 for Possession of A Controlled Substance w/
Intent, Criminal Court Division 1 by Judge Skahan. The
Durango license plate showed to be registered to Tommie
Conner as well.

(Id.) After the search warrant was obtained, officers searched

Conner's vehicle and found "a black magazine in the center console

cupholder loaded with 9mm live rounds and an orange and black SCCY

CPX1 9mm handgun SN#825509 loaded with magazine and 1 live round

in the chamber on the floorboard of the front passenger side."

(ECF No. 45 at PageID 58.) On September 30, 2021, Conner was

indicted for being a felon in possession of a firearm. (ECF No.

1.)

     On May 25, 2023, Conner filed a motion to suppress all items

seized from the Dodge Durango under Franks v. Delaware, 438 U.S.

154 (1978). (ECF No. 45 at PageID 62.) It is Conner's contention

that "[t]he information that is contained in the Affidavit of

Complaint and the Affidavit for Search Warrant directly conflicts

with the statements and actions that can be seen on the police-

worn body cameras." (Id. at PageID 59.) First, Conner says that

the statement that officers "attempted to pull over a black Dodge

Durango for speeding westbound on American Way" is false because

he claims that "it is not readily apparent that the police officer

- 7 -

is pulling the driver over." (Id. at PageID 60.) Conner also claims

the statement that "[t]he driver of the Durango refused to pull

over to the activated blue lights and sirens behind him" is untrue

because the body-worn camera shows that the officer did not turn

on his vehicle's lights until he was turning into the Waffle House

parking lot. (Id.) In another alleged inconsistency, Conner points

out that although the warrant states that "the driver of the

Durango opened the driver side door and ran from the vehicle,"

Officer Walker says on camera that he did not see Conner exit the

vehicle. (Id.) Officer Walker also says, "I stopped you, you got

out and walked to the front door, I went to go talk to someone and

you ran," which Conner argues is further evidence of contradiction.

(Id. at PageID 61.) According to Conner, "[a]t no point does Tommie

Conner run from the vehicle or engage the officers in a foot

chase." (Id.) Conner asserts that these inconsistencies were made

"knowingly and intentionally, or with reckless disregard for the

truth" and that they were necessary to the finding of probable

cause. (Id.) For that reason, he argues the warrant should be found

invalid and the results of the officers' search suppressed. (Id.)

He added an additional claim in his September 27, 2023 motion,

arguing that the government failed to establish that there was

probable cause to pull him over in the first place. (ECF No. 66 at

PageID 102.)

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Probable Cause to Initiate Traffic Stop

This circuit applies two different standards for traffic stops depending upon the nature of the alleged infraction. For "completed" traffic violations, the Sixth Circuit has required probable cause to justify an investigatory stop. United States v. Guajardo, 388 F. App'x 483, 487 (6th Cir. 2010); see also United States v. Eggleston, No. 20-cr-20121-JTF-tmp, 2021 WL 1324625, at *2 (W.D. Tenn. Feb. 12, 2021) (citing Guajardo). However, for "ongoing" traffic violations, the Sixth Circuit requires that the officer only have a reasonable suspicion to justify an investigatory Terry stop. United States v. Simpson, 520 F.3d 531, 541 (6th Cir. 2008); see also Eggleston, 2021 WL 1324625, at *2 (citing Simpson).

A traffic violation is deemed "completed" when, by the time the driver is pulled over, they are no longer committing the violation, whereas a violation is deemed "ongoing" when the violation does not cease when the driver is pulled over. Compare United States v. Jeffries, 457 F. App'x 471, 477 (6th Cir. 2012) ("Out of an abundance of caution, we assume that [defendant's] driving too closely was a completed traffic violation — insofar as the violation was completed by the time she was pulled over — and therefore the probable cause standard applies.") with Eggleston, 2021 WL 1324625, at *2 ("One such ongoing traffic violation is

- 9 -

driving with an obstructed license plate . . . as the violation continues after the driver is pulled over."). Because Conner was no longer speeding when he was pulled over, his speeding was a completed traffic violation and the probable cause standard applies.

An "officer may conduct a stop based on information obtained by fellow officers," pursuant to the collective knowledge doctrine. United States v. Lyons, 687 F.3d 754, 765–66 (6th Cir. 2012) (citing United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990)). Probable cause for a stop "'may be established from the collective knowledge of the police,' rather than solely from the officer who actually made the stop." United States v. Davis, 565 F. Supp. 2d 841, 850 (N.D. Ohio 2008), aff'd, 361 F. App'x 632 (6th Cir. 2010) (quoting Collins v. Nagle, 892 F.2d 489, 495 (6th Cir. 1989)). "As with any traditional investigatory stop, a traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in scope to the situation at hand." Id.; see also United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005).

Conner argues that there was no probable cause to initiate the stop because Officer Walker – the officer who made the stop – could not ascertain that Conner was speeding. (ECF No. 66 at PageID 101.) After reviewing the body-worn camera video, Conner argues that the officer appears to have been looking at and typing on his

PDA prior to the stop, which Conner argues negates the officer's ability to verify that Conner was speeding. (Id.; Dec. Tr. at 74.) He also argues that Officer Roberts did not pace Conner long enough to accurately determine his speed. (Dec. Tr. at 74.) In support of his claim that inconclusive evidence of speeding renders a stop unlawful, Conner cites United States v. Dillard-Cribbs, 6:17-CR-38-7-GFVT, 2018 WL 916365 (E.D. Ky. Feb. 16, 2018). (ECF No. 66 at PageID 102.) In Dillard-Cribbs, the district court found that no probable cause existed for a traffic stop when there was no evidence to support the officer's statement that the defendant was travelling at "a high rate of speed[.]" 2018 WL 916365 at *4. The court explained:

> There is no evidence before the Court of either the posted speed limit where Dillard-Cribbs was stopped or the speed at which Dillard-Cribbs's [sic] was travelling. There is no evidence before the Court to suggest Trooper Gaby had to speed in order to catch up with Dillard-Cribbs. There is no dash cam evidence that might support a finding of probable cause. There is only a conclusory statement from Trooper Gaby that Dillard-Cribbs's [sic] was speeding.

Id.

Here, Officer Roberts testified that he had to exceed the speed limit to pace Conner. (Dec. Tr. at 56, 68–70.) The amount of time Officer Roberts spent pacing Conner is largely irrelevant because if he kept pace for even a moment at a speed above the limit, he had probable cause to initiate a traffic stop. Once Officer Roberts called Officer Walker about the vehicle speeding,

- 11 -

Officer Walker was authorized to pull Conner over under the collective knowledge doctrine. See Lyons, 687 F.3d at 766.

Officer Walker also had independent grounds to pull Conner over. The undersigned recognizes that the speedometer from Officer Walker's vehicle as he paced Conner is not visible from the body-worn camera footage, and he spent part of the pacing time typing into his PDA device. However, the undersigned finds credible Officer Walker's testimony that "[t]here's a big digital speedometer in the middle of the dash and there's also a mechanical one plus I have one on my GPS," marking three separate places Officer Walker could determine his speed. (Dec. Tr. at 23.) The undersigned finds credible the officer's testimony that he was aware at some point during the drive that he was exceeding the speed limit in order to keep apace of Conner's vehicle. The situation here is different from Dillard-Cribbs. Two officers credibly testified that Conner exceeded the speed limit. Thus, there is significantly more reliable evidence here that Conner was speeding than there was in Dillard-Cribbs, where a single officer's conclusory statement that the defendant was speeding without more was deemed insufficient.

Regarding the MPD pacing policy, the undersigned finds no evidence that either officer violated it. Moreover, even if the officers had failed to strictly adhere to the pacing policy, suppression would not be warranted under the facts of this case.

- 12 -

This court has previously discussed the applicability of adherence

to police department policy in the suppression context:

> The requirement that police officers adhere to "standard
> criteria" in the context of an inventory search does not
> reflect a formalistic requirement that law enforcement
> officers follow all official policies at all times or
> face suppression of evidence. Colorado v. Bertine, 479
> U.S. 367 (1987). Police officers must follow standard
> criteria when conducting inventory searches because "an
> inventory search must not be a ruse for a general
> rummaging in order to discover incriminating evidence."
> Florida v. Wells, 495 U.S. 1, 4 (1990). There is no
> concern that law enforcement pursuit of a suspect can
> become a "pretext for broad searches" of that suspect's
> belongings. Id. (Brennan, J., concurring). The policy
> concerns about pretext and the ease of violating
> established Fourth Amendment warrantless search
> requirements that animate the Supreme Court's inventory
> search jurisprudence do not extend to police chases.
> Defendant's case citation in support of his argument was
> analyzed under an excessive force framework, not a
> violation of police policy standing alone, and is
> inapplicable in the instant case. See Cline, 526 P.3d at
> 697.
>
> Additionally, suppression would not be an appropriate
> remedy. Defendant argues that the exclusionary rule is
> applied "to discourage certain police behaviors" and
> that when law enforcement policies are violated "the
> appropriate remedy is suppression of improperly obtained
> evidence." Suppression is not a blanket remedy for every
> violation of an individual's constitutional rights by
> law enforcement, let alone a blanket remedy for every
> violation of a law enforcement agency's internally
> formulated policies. See Hudson v. Michigan, 547 U.S.
> 586, 594 (2006) ("Since the interests that were violated
> in this case have nothing to do with the seizure of the
> evidence, the exclusionary rule is inapplicable").

United States v. Moore, No. 2:23-CR-20014-JPM-1, 2023 WL 4824930,

at *2-3 (W.D. Tenn. July 27, 2023) (internal citation to case

record omitted). Similarly, in this case, a violation of the MPD

pacing policy would not warrant suppression. Because Officer
Walker had probable cause to pull Conner over based on his pacing
and Officer Roberts's pacing, the traffic stop was lawful.

**B.    Falsity of Statements Contained in the Warrant**

In Franks v. Delaware, the Supreme Court held that a search
based on a warrant that contains deliberately or recklessly false
allegations is invalid unless the remaining portions of the
affidavit provide probable cause. 438 U.S. 154, 156 (1978). "A
Franks hearing is an evidentiary hearing during which defendants
are allowed to present evidence concerning the veracity of the
challenged statements in the search warrant affidavit." United
States v. Kelley, 596 F. Supp. 2d 1132, 1149 (E.D. Tenn.
2009) (citing United States v. Keszthelyi, 308 F.3d 557, 566–68
(6th Cir. 2002)); see also United States v. Brooks, No. 11-cr-
20137 Ml/P, 2011 WL 7081072, at *3 (W.D. Tenn. Dec. 8, 2011) ("The
purpose of a Franks hearing is to allow the defendant to challenge
the truthfulness of statements in an affidavit in order to
challenge the legality of a search warrant issued on the basis of
the affidavit.") (internal quotation marks and citation omitted)).
As the Sixth Circuit has explained:

> To obtain a Franks hearing, the movant must provide a
> substantial preliminary showing that a false statement
> was made either knowingly or intentionally, or with
> reckless disregard for the truth. The movant
> must *also* show that the allegedly false statements were
> necessary for the magistrate's determination of probable
> cause. Therefore, "if, when material that is the subject

- 14 -

of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."

United States v. Mastromatteo, 538 F.3d 535, 545 (6th Cir. 2008) (emphasis in original) (quoting Franks, 438 U.S. at 171-72).

It is Conner's contention that four statements contained in the warrant are false: 1) that the officer activated blue lights and sirens behind the Durango on American Way; 2) that Conner refused to pull over; 3) that after parking, Conner ran from the Durango; and 4) that Conner engaged the officers in a brief foot chase. (ECF No. 45.)

The undersigned finds that the first statement, that an officer activated his lights and sirens on American Way prior to entering the Waffle House parking lot, is not false. Both Officer Walker's dashcam footage and his body-worn camera footage show that he activated his lights and sirens when both cars were about a block away from the entrance to the Waffle House parking lot. (Ex. No. 3, video 1 at 0:59; video 2 at 2:48.) The undersigned does not agree that "it is not readily apparent that the police officer is pulling the driver over." (ECF No. 45 at PageID 60.) Officer Walker's vehicle was immediately behind the Durango when he activated his lights and sirens. (Ex. No. 3, video 2 at 2:48.) When the Durango pulled into the Waffle House parking lot, the

- 15 -

police vehicle followed. (Id. at 3:04.) These actions make it clear that Officer Walker was attempting to pull over the Durango.

The second statement is also not false. At the time that Officer Walker activated his lights and siren, Conner had already turned on his right turn signal and was navigating into the rightmost lane of American Way. (Ex. No. 3, video 2 at 2:49.) When the lights and sirens were activated, he did not pull to the shoulder of American Way. (Id. at 3:00.) Conner also did not acquiesce to the traffic stop by pulling into a parking spot in the Waffle House parking lot. Although he did park his car there, he immediately exited the vehicle and attempted to avoid interaction with the police. (Ex. No. 3, video 2 at 3:20.) Based on these events, the undersigned finds that the warrant's characterization of Conner's actions as a refusal to pull over was not false.

The statement that Conner "ran from the vehicle" was also not false. Dashcam footage recorded the Durango driving into the Waffle House parking lot and coming to a stop. (Ex. No. 3, video 2 at 3:01.) A shadow can be seen moving under the car. (Id. at 3:15.) No officer physically witnessed Conner leaving the Durango, and the event is not captured on video. But by the time Officer Walker approached the Durango, it was empty. (Ex. No. 3, video 1 at 1:47.) Common sense tells us that the driver of the car exited the vehicle. Furthermore, although it cannot be known for certain

- 16 -

whether Conner was running in that moment, he did run from police less than a minute after speaking with Officer Walker. (Id. at 4:04.) Though the warrant could have been more clearly drafted, the undersigned finds that the language "the driver of the Durango opened the driver side door and ran from the vehicle" is not a false characterization of what occurred.

As for the last alleged inconsistency, the undersigned finds that the statement that officers "were able to detain the driver after a brief foot chase" is not false either. Officers on the scene chased Conner twice before successfully detaining him. First, the officers drove to the Home 1 Extended Stay, where Conner had walked to after leaving the Waffle House. (Ex. No. 3, video 2 at 12:27.) Although several officers ran around the hotel, they were not able to apprehend Conner. Officer Walker then saw Conner a second time near the hotel. (Id. at 15:15.) He began to chase Conner once more. (Id.) Once Officer Walker reached Conner, he placed him in handcuffs. (Id. at 15:28.) The footage shows that officers were able to detain Conner after not one, but two brief foot chases. The undersigned finds that the mention of a foot chase in the warrant was not false.

## C. Whether Statements Were Necessary for Probable Cause

Regardless of whether the statements identified by Conner are false, he is not entitled to a Franks hearing because he has not shown that the statements were necessary for probable cause.

- 17 -

Mastromatteo, 538 F.3d at 545. Probable cause for the issuance of a search warrant exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Berry, 565 F.3d 332, 338 (6th Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 236 (1983)). Even setting aside the statements that Conner claims are false, the facts set forth in the application for a search warrant are sufficient to establish a fair probability that evidence of a crime would be found in Conner's vehicle. The warrant stated that Conner "showed to be a convicted felon as of 05/03/2001[.]" (ECF No. 49-1.) It further stated that officers "could see through the driver window an orange and black handgun on the passenger floor board" of a car that "showed to be registered to Tommie Conner." Taken together, these undisputed statements were sufficient to establish probable cause that Conner had violated T.C.A. § 39-17-1307, Tennessee's "felon in possession" law, by possessing a firearm. The undersigned therefore finds that Conner has not succeeded in making the necessary showing under Franks.

### III. RECOMMENDATION

For the reasons above, it is recommended that Conner's Motion to Suppress be denied.

Respectfully submitted,

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

- 18 -

February 16, 2024
Date

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**