**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cr-20216-JTF |
| | ) | |
| **TOMMIE CONNER,** | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADOPTING THE CHIEF MAGISTRATE JUDGE'S AMENDED REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPRESS**

Before the Court is Defendant Tommie Conner's Motion to Suppress items seized during a search of his vehicle under *Franks v. Delaware*, 438 U.S. 154 (1978), filed on April 25, 2023. (ECF No. 45.) The Government responded on May 9, 2023. (ECF No. 49.) On April 28, 2023, the Motion was referred to the Chief Magistrate Judge, who held a hearing on the Motion. (ECF Nos. 48 & 55.) The Chief Magistrate Judge issued a Report and Recommendation ("R & R") to Deny Defendant's Motion on July 28, 2023. (ECF No. 60.)

On September 27, 2023, Defendant filed a Motion to Reopen Suppression Hearing and Suppress Evidence. (ECF No. 66.) In the Motion, Defendant "explain[ed] that [Defendant] learned of 'new evidence' because defense '[c]ounsel had technical issues with his copy [of the body camera footage] to which the Government provided another copy.'" (*Id*.) The Court granted the Motion to Reopen, and referred the matter to the Chief Magistrate Judge. (*See id*. & ECF Nos. 67, 71.) The Government responded on October 24, 2023. (ECF No. 69.) The Chief Magistrate Judge held a hearing on the Motion, (ECF No. 75), and entered an Amended R & R recommending

that the Motion to Suppress be denied on February 16, 2024. (ECF No. 78.) Subsequently, Defendant timely filed his Objections to the Amended R & R on March 1, 2024. (ECF No. 81.) For the reasons provided herein, the Court **ADOPTS** the Chief Magistrate Judge's Amended R & R and **DENIES** Defendant's Motion to Suppress.

## I. LEGAL STANDARD

Congress passed 28 U.S.C. § 636(b) "to relieve some of the burden on the federal courts by permitting the assignment of certain district court duties to magistrate judges." *United States v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001). Pursuant to the provision, magistrate judges may hear and determine any pretrial matter pending before the Court, except various dispositive motions. 28 U.S.C. § 636(b)(1)(A). Regarding those excepted dispositive motions, magistrate judges may still hear and submit to the district court proposed findings of fact and recommendations for disposition. 28 U.S.C. § 636(b)(1)(B). Upon hearing a pending matter, "the magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed. R. Civ. P. 72(b)(1); *see also Baker v. Peterson*, 67 Fed. App'x. 308, 310 (6th Cir. 2003). Any party who disagrees with a Magistrate Judge's recommendation may file written objections. Fed. R. Civ. P. 72(b).

The standard of review applied by the district court depends on the nature of the matter considered by the magistrate judge. *See Baker*, 67 F. App'x at 310 (citations omitted). Motions to suppress evidence are among the motions in criminal cases that are subject to *de novo* review. *See* 28 U.S.C. § 636 (b)(1)(A); *U.S. Fid. & Guarantee Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1088 (6th Cir. 1992). Upon review, the district court may accept, reject, or modify the proposed findings or recommendations of the magistrate judge. *Brown v. Bd. of Educ.*, 47 F. Supp. 3d 665, 674 (W.D. Tenn. 2014); *see also* 28 U.S.C. § 636(b)(1). A district judge should adopt the findings and rulings of the magistrate judge to which no specific objection is

filed. *Brown*, 47 F. Supp. 3d at 674. The district court is not required to review "a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## II.  FACTUAL OBJECTIONS

In the R & R, the Chief Magistrate Judge sets forth proposed findings of fact based on the evidence presented at the suppression hearings and the parties' briefs. (ECF No. 78, 2–8.) The evidence presented included body-worn camera footage from Officer Ryan Walker of the Memphis Police Department ("MPD"), dashcam footage from his vehicle, and testimony from MPD Officers Ryan Walker and Jacques Roberts.

On March 4, 2021, Officer Roberts observed a black Dodge speeding in a forty-five mile per hour zone down American Way. (*Id*. at 2.) Officer Roberts testified that he sped up, drove one lane over approximately twenty feet behind Defendant, matched Defendant's speed, "estimate[ing] his speed to be 60 miles per hour." (*Id*. at 2–3.) He also testified that he paced the Durango for about "five to ten seconds" up and until it turned toward a hotel. (*Id*. at 3.) Officer Roberts called Officer Walker, his task force partner, and relayed information about the speeding violation and description of the Durango. (*Id*.)

Officer Walker testified that soon thereafter, he spotted the vehicle and began to follow and pace the Durango, which was traveling about 48 miles per hour. (*Id*.) During this span, Officer Walker held his PDA in one hand to "verify[] the tag on the vehicle at the time." (*Id*.) After following the vehicle for less than a minute, Officer Walker activated his blue lights and siren. (*Id*. at 4.) The driver of the vehicle, later identified as Defendant, did not immediately pull over, but turned into the parking lot of a Waffle House restaurant and pulled into a parking space. (*Id*.) Officer Walker followed the vehicle onto the parking lot. (*Id*.) He testified that initially, he could only see the passenger side of the vehicle and did not see anyone exit. (*Id*.) Officer Walker

3

approached the vehicle and found no one inside. (*Id.*) However, he did observe a firearm and magazine inside the vehicle. (*Id.*)

Officer Walker wanted to locate the driver, so he asked a group of individuals gathered outside the Waffle House if they had seen anyone leave the vehicle. (*Id.*) One of the individuals pointed to the right; Officer Walker moved in that direction and saw Defendant walking away from the direction of the Durango. (*Id.* 4-5.) Upon making contact, Defendant told Officer Walker that he was not the owner of the Durango and that he was dropped off at the Waffle House. (*Id.*) Even though Officer Walker asked a fellow officer to keep an eye on Defendant, soon thereafter, the Defendant left on foot. (*Id.*) Another officer radioed that he had spotted Defendant at a hotel near the Waffle House. (*Id.*) Initially, Officers were unable to apprehend him, but Officer Walker saw him again walking near the hotel. (*Id.*) Officer Walker called and chased Defendant, and after catching up to him, Officer Walker placed him in handcuffs. (*Id.* at 6.) Once Defendant identified himself, the officers found that the Durango was registered to him. (*Id.*) A background check revealed that Defendant had multiple felonies and a revoked driver's license. (*Id.*) Officers then obtained a search warrant. The search warrant affidavit stated in relevant part:

> On March 4, 2021, Officers of the Memphis Police Department attempted to pull over a black Dodge Durango for speeding westbound on American Way near Clearbrook Street. The driver of the Durango refused to pull over to the activated blue lights and sirens behind him. The Durango continued going westbound American Way [sic] until it pulled onto the private drive of Waffle House, 4276 American Way, and stopped on the southwest corner of the parking lot. At that time, the driver of the Durango opened the driver side door and ran from the vehicle. Officers were able to detain the driver after a brief foot chase. The driver was identified as Tommie Conner, showed to have a revoked driver's license as of 01/1997 for DUI. Officer returned to the Durango and could see through the driver window an orange and black handgun on the passenger floorboard and a semiautomatic handgun magazine loaded with bullets on the center console. Officers attempted to open the door to the Durango, but it was locked. Conner refused to open the vehicle and said he did not know where the keys to his Durango

4

> were anymore. A check of Conner's information showed not only was his driver's license revoked, but he showed to be a convicted felon as of 05/03/2001 for Possession of A Controlled Substance w/ Intent, Criminal Court Division 1 by Judge Skahan. The Durango license plate showed to be registered to Tommie Conner as well.

(*Id*. at 6–7.) The officers searched Defendant's vehicle and found "a black magazine in the center console cupholder loaded with 9mm live rounds and an orange and black SCCY CPX1 9mm handgun SN#825509 loaded with magazine and 1 live round in the chamber on the floorboard of the front passenger side." (*Id*. at 7.) On September 30, 2021, Defendant was indicted for being a felon in possession of a firearm. (ECF No. 1.)

Defendant objects to the Chief Magistrate Judge's proposed findings of fact that "1) the officer activated blue lights and sirens behind the Durango on American Way; 2) that Conner refused to pull over; 3) that after parking, Conner ran from the Durango; and 4) that Conner engaged officers in a brief foot chase." (ECF No. 81, 2.)

**<u>Objections 1 & 2: Activation of Blue Lights & Refusal to Pullover</u>**

Defendant objects to the proposed findings of fact that the officer activated blue lights and sirens behind the Durango on American Way and Defendant refused to pull over. (*Id*. at 4.) Defendant asserts that the account in the affidavit contradicts the officer's statement captured on bodycam that Officer Walker activated the blue lights as he pulled into the parking lot. (*Id*.) Defendant further contends that it is not clear from the footage whether the officer is actually pulling Defendant over as he pulls into the parking lot of a Waffle House restaurant behind Defendant's Durango. (*Id.*) Defendant also argues that the officer's statements heard in the footage are inconsistent. (*Id*. at 5.) First the officer states that "he did not turn on his blue lights until he was turning into the parking lot." (*Id.*) He later explains to fellow officers that he activated the lights "'right in the [\*\*\*] lot' then changes his statement to 'right before we turned in the lot.'"

5

(*Id.*)  Additionally, Defendant says that the bodycam footage also captures Defendant explaining to Officer Walker that "he didn't see the officer behind him."  (*Id.*)

The affidavit states that Defendant refused to pull over after Officer Walker activated the blue lights, but the proposed findings of fact state that Defendant pulled into the parking lot immediately after Officer Walker activated the blue lights and siren.  (ECF No. 78, 6.)  A review of the Amended R&R shows that the Chief Magistrate Judge found that the officer activated the blue lights a block from the entrance of the Waffle House parking lot.  (*Id*. at 15.)  The Chief Magistrate Judge also found that the statements at issue were not false, reasoning that Officer Walker's actions of driving immediately behind Defendant when he activated the blue lights and siren and continuing to follow the Durango as it entered the parking lot made it clear that he was attempting to pull Defendant over.  (*Id*. at 15–16.)  Moreover, the Chief Magistrate Judge also reasoned that Defendant's failure to acquiesce to the traffic stop by instead pulling into a parking lot demonstrated Defendant's refusal to pull over.  (*Id*. at 16.)

Objections 1 & 2 are without merit and are **OVERRULED**.

**Objection 3 & 4: Defendant's Flight from the Durango and Officers' Foot Chase**

Next, Defendant objects to the Chief Magistrate Judge's proposed finding of fact that he ran from the Durango.  (ECF No. 81, 4.)  Defendant again attempts to support his objection relying on the statements in the affidavit and the officer's statements on his bodycam.  (*Id*. at 5.)  Defendant points out that Officer Walker stated, "I don't know if I was focusing on the spotlight, but when I went up to the car, nobody was there, so I went to talk to dude who was at the front door, he says he wasn't in the car, and I can't place him in the car on the traffic stop."  (*Id*.)  Defendant further argues that the Amended R & R also states that he "walked from the Waffle House" before being detained.  (*Id*.)  Based on these observations, Defendant argues that nothing demonstrates that he fled from the Durango and led officers on a foot chase.  (*Id*. at 6.)

The Chief Magistrate Judge found that although no officer witnessed Defendant exit the vehicle, the dashcam footage shows, "a shadow moving under the car," helping to explain and corroborate Defendant's disappearance from the vehicle. (*Id*.) When Officer Walker approached the vehicle, it was empty. (*Id*.) Reasoning that "common sense" showed that the driver exited the vehicle, the Chief Magistrate Judge found that the statement in the affidavit that Defendant ran from the vehicle "[was] not a false characterization of what occurred." (*Id*. at 17.) The Chief Magistrate Judge also found that the footage showed that "officers were able to detain Defendant after not one, but two brief foot chases." *Id*.

Objections 3 & 4 are without merit and are **OVERRULED**.

Upon *de novo* review of the suppression hearing record, it appears that Defendant's factual objections should be overruled. Although there may be a few inconsistencies between testimony and footage captured on body cam video evidence, those inconsistencies, standing alone, are inconsequential and insignificant when reviewing the entire record adduced during the suppression hearing. Any inconsistencies will be ripe areas for defense counsel to explore during his cross examination of the officers, assuming Defendant elects to exercise his right to jury trial.

Accordingly, Defendant's factual objections challenging the Chief Magistrate Judge's assessment of the evidence before him are **OVERRULED**. Therefore, the Court **ADOPTS** and incorporates the Chief Magistrate Judge's proposed findings of fact.

### III.  LEGAL OBJECTIONS

The Magistrate Judge recommends that the Court deny Defendant's Motion to Suppress because: 1) there was probable cause to initiate the stop; 2) the statements contained in the warrant were not false; and 3) Defendant failed to show he was entitled to a *Frank*'s hearing.

**Objection No. 3: Probable Cause to Initiate the Traffic Stop**

In the Motion to Reopen, Defendant asserts there was no probable cause to initiate the stop. (ECF No. 66.) A stop is not unlawful if an officer has probable cause to believe a traffic violation has occurred or was occurring. *United States v. Carter*, 662 F. App'x 342, 346 (6th Cir. 2016). To assess probable cause, officers "need not rely solely on the information that they witness first-hand." *Bauman v. Millisor*, No. 21-1527, 2022 WL 35470, at *3 (6th Cir. Jan. 4, 2022). Rather, "[t]he collective-knowledge doctrine permits an officer to conduct a stop based on information obtained from fellow officers." *Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (citation and internal quotation marks omitted). Thus, courts look to the "collective knowledge of [officers] working as a team . . . in determining probable cause," so long as there is evidence that shows officers shared the relevant information among themselves. *United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (citation omitted). Speeding is a traffic violation and provides an officer with probable cause to stop a vehicle. *Carter*, 662 F. App'x at 346 (citing *United States v. Wellman*, 185 F.3d 651, 655–56 (6th Cir. 1999)).

The Chief Magistrate Judge found that Officer Walker had probable cause to initiate the stop under the collective knowledge doctrine when Officer Roberts radioed him that he had observed Defendant speeding. (ECF No. 78). In general, Defendant objects to the Chief Magistrate Judge's findings that probable cause existed to initiate the traffic stop because neither officer paced him long enough to ascertain his speed. (ECF No. 81, 3-4.) However, the Sixth Circuit has found determining whether a defendant was speeding based upon pacing to be an acceptable means of supporting probable cause without regard to the amount of time spent pacing. *Carter*, 662 F. App'x at 346-47. Thus, the Court **REJECTS** Defendant's objection that there was no probable cause to initiate the traffic stop.

**Objection No. 3: Probable Cause Absent the Statements at Issue**

Defendant objects to the Chief Magistrate Judge's probable cause finding regarding certain statements in the search warrant affidavit. (ECF No. 81, 2.) In support of his objection, Defendant avers that absent the false statements in the affidavit for the warrant, probable cause did not exist to facilitate the issuance of the search warrant. (ECF No. 81, 6.) The Chief Magistrate Judge found that Defendant failed to show that the alleged false statements relied upon in the affidavit for the warrant were necessary for a finding of probable cause. Thus, the Defendant failed to make an initial showing that the affidavit contained material falsehoods that would entitle him to a *Frank*'s hearing. (ECF No. 78, 17.)

In *United States v. Mastromatteo*, 538 F.3d 535 (6th Cir. 2008), the Sixth Circuit explained what must be shown before a defendant would be entitled to a *Frank*'s hearing:

> To obtain a *Franks* hearing, the movant must provide a substantial preliminary showing that a false statement was made either knowingly or intentionally, or with reckless disregard for the truth. The movant must *also* show that the allegedly false statements were necessary for the magistrate's determination of probable cause. Therefore, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks,* 438 U.S. at 171–72 (footnote omitted).

*Mastromatteo*, 538 F.3d at 545.

To obtain a *Frank*'s hearing, and for Defendant to prevail on a showing that probable cause to support the issuance of a search warrant was lacking, Defendant had to first show that alleged false statements were made either intentionally or knowingly, or with reckless disregard for the truth. Second, Defendant also had to show that after stripping the alleged false statements from the affidavit, probable cause was lacking. Probable cause exists to obtain a search warrant "when an affidavit shows a 'fair probability' that criminal evidence will be found in the place to be searched.

9

*See United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)). The Chief Magistrate Judge found that even absent the challenged statements, "the facts set forth in the application for the search warrant [were] sufficient to establish a fair probability that the evidence of a crime would be found in [Defendant's] vehicle." (ECF No. 78, 11.) The Amended R&R states that taken together, Defendant's felon status, the fact that officers spotted a handgun in the vehicle at the scene, and that the vehicle was registered to Defendant were sufficient statements to support a probable cause that Defendant possessed a firearm in violation of Tennessee law. (*Id*. at 18.)

The Court **REJECTS** Defendant's objection that there was no probable cause to issue the warrant absent the alleged false statements and **ADOPTS** the Chief Magistrate Judge's finding that probable cause still existed to issue the warrant.

Therefore, the Court **ADOPTS** the Chief Magistrate Judge's recommendation that Defendant was not entitled to a *Frank*'s hearing.

### IV. CONCLUSION

Upon *de novo* review of the record, the Court hereby **OVERRULES** Defendant's factual and legal objections, **ADOPTS** the Chief Magistrate Judge's Amended Report and Recommendation, and **DENIES** Defendant's Motion to Suppress.

**IT IS SO ORDERED** this 12th day of April 2024.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE